**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,**

v.

**ANTHONY COMPANY, et al., Defendants.**

**No. 81C1716.**

United States District Court, N. D. Illinois, E. D.

April 27, 1982.

---

See also, D.C. 542 F.Supp. 43.

Henry Rose, James N. Dulcan, Stephen P. Schreiber, Francis P. Grealy, Jr., Washington, D. C., for plaintiff.

Leonard Schanfield, Mark S. Lieberman, David M. Rosenthal, Rosenthal & Schanfield, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Pension Benefit Guaranty Corporation ("PBGC") sues Anthony Company ("Anthony") and its parent company M. S. Kaplan Company ("Kaplan") under Section 4062 of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1362,[1] to recover the vested but unfunded benefits[2] under Anthony's pension plan (the "Plan") as of the time of its termination. Kaplan has moved that it be dismissed from the Complaint, and PBGC has cross-filed a motion for partial summary judgment. For the reasons stated in this memorandum opinion and order Kaplan's motion is denied and PBGC's is not ruled upon.

1. All further statutory citations in this opinion will be to Title 29 rather than to ERISA's internal numbering.

2. For many years the Internal Revenue Code (the "Code") has exercised a degree of control over retirement plans by defining the terms on which deductibility of contributions will be permitted. As to pension or "defined-benefit" plans, which promise fixed benefit levels after retirement (typically varying with an employee's compensation level and years of service, and usually giving credit for years of service before the plan was adopted), the Code has not mandated that all "past service liability" (the actuarial cost of paying benefits for the pre-plan-adoption years of service) be currently funded. Instead it has been sufficient to make annual payment of (a) "normal costs" (benefit liabilities accruing during the current year, also calculated in actuarial terms, plus current expenses of administration) plus (b) an amount that would amortize past service liability over a period as long as 30 years. If a plan terminates, the Code has triggered vesting of accrued benefits, but there could obviously be (and usually is) a substantial gap between such vesting and the prior funding. ERISA was enacted to deal with that and other problems perceived in the area of private pension plans.

**1050**

*Facts*

Anthony adopted the Plan May 1, 1955 to cover its union employees pursuant to its collective bargaining agreement with the UAW. On February 21, 1978 Anthony filed a petition under Chapter XI of the Bankruptcy Act. Then, finding itself unable to develop a viable plan of reorganization, Anthony sold its principal assets to a purchaser unwilling to adopt the Plan. Anthony terminated the Plan December 29, 1978 and ultimately shifted its Chapter XI petition into a straight bankruptcy proceeding June 20, 1979.

At the time of the Plan's termination there was a large disparity (PBGC claims some $1.4 million) between the current value of the Plan assets and the employees' vested benefits. Under ERISA PBGC is obligated to make good that deficiency. Section 1362 gives PBGC the right in turn to recover from the "employer" the lesser of (1) the deficiency itself and (2) 30% of the employer's net worth.

PBGC filed this action in part to collect what it could from Anthony, and that aspect of its claim is not now in dispute. What *is* at issue is whether Kaplan is also embraced within the term "employer" (both for liability purposes and for the 30%-of-net-worth calculation).

Kaplan has been Anthony's majority shareholder since April 1957. As the result of minor stock purchases over the intervening years, by September 1976 Kaplan owned 5,550 of Anthony's 10,000 outstanding shares. At that point Anthony itself contracted to purchase the 4,450 shares owned by shareholders other than Kaplan. That transaction was consummated October 21, 1976, leaving Anthony a wholly-owned Kaplan subsidiary through the date of Plan termination.

*Kaplan as "Employer" for Section 1362 Purposes*

■ PBGC seeks recovery under Section 1362(b), which "applies to any employer who maintained a single employer plan at the time it was terminated...." Section 1362 is part of ERISA's Subchapter III, whose definitional section includes the following provision (Section 1301(b)(1)):

For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under Section 414(c) of Title 26.

Temporary income tax regulations were promulgated by the Secretary of the Treasury November 5, 1975 and adopted by PBGC March 24, 1976. 29 C.F.R. § 2612 (the Regulations).

Those Regulations define three "common control" situations:[3]

(1) "Parent-subsidiary groups" involve relationships essentially equivalent to those required for filing consolidated returns under the Code: The parent must own a "controlling interest," defined (for a subsidiary having only one class of stock) as ownership of at least 80% of the outstanding stock.

(2) "Brother-sister groups" depend on "effective control," defined to cover closely-held situations in which the same five (or fewer) shareholders own at least 50% of the stock in each member of the group.

(3) "Combined groups" involve at least three entities, each of which is a member of either a parent-subsidiary group or a brother-sister group, and at least one of which is both a parent in a parent-subsidiary group and a member of a brother-sister group.

At least from October 1976 Kaplan and Anthony unquestionably formed a "parent-subsidiary group of trades or businesses under common control," so that by its terms

---

**3.** Appendix A contains the relevant portions of the Regulations.

Section 1301 requires them to be treated as a "single employer" for ERISA Subchapter III purposes.[4]

Kaplan however disputes the applicability of the Section 1301 definition, pointing instead to a portion of Section 1362 itself:

(d) For purposes of this section the following rules apply in the case of certain corporate reorganizations:

(1) If an employer ceases to exist by reason of a reorganization which involves a mere change in identity, form, or place of organization, however effected, a successor corporation resulting from such reorganization shall be treated as the employer to whom this section applies.

(2) If an employer ceases to exist by reason of a liquidation into a parent corporation, the parent corporation shall be treated as the employer to whom this section applies.

(3) If an employer ceases to exist by reason of a merger, consolidation, or division, the successor corporation or corporations shall be treated as the employer to whom this section applies.

Because Anthony has always remained a separate corporate entity (it has not "ceased to exist"), none of the subsections of Section 1362(d) is literally applicable. Kaplan urges that such inapplicability (with particular emphasis on Section 1362(d)(2)) means that Kaplan is not part of the "employer" for *any* purposes under Section 1362. That argument is untenable for the reasons next discussed.[5]

By the unambiguous language of Section 1301(b)(1), its treatment of a "common control" group as a "single employer" applies for the "purposes of this subchapter [III]"— and thus to Section 1362. Under the Regulations Kaplan and Anthony are thus a "single employer" for Section 1362 purposes as a matter of straightforward reading.

Kaplan attacks that conclusion on several grounds. It first contends that Section 1362(d) would be superfluous if the broad definition of "employer" stated in the Regulations and incorporated in Section 1301 were applied. But *Ouimet*, 630 F.2d at 11, pointed out that although there were similarities, Section 1362 might apply to certain cases not covered by Section 1301:

On this point, we agree with the district court's observation; since the definition of "parent" in the regulations under 26 U.S.C. § 1414(c) is not incorporated into Section 1362, there may be situations in which an employer is liquidated into a parent corporation which does not meet the definition of "parent" that is used to define a group under common control. In such a situation, Section 1301(b) would not apply, and Section 1362(d)(2) would be necessary to impose liability on the parent.

Essentially that analysis assumes that a "parent" can be a more than 50% and less than 80% shareholder (as Kaplan was from 1957 to 1976), giving Section 1362(d)(2) some independent room for operation. Kaplan disputes the *Ouimet* analysis, stating that in the hypothesized situation the two corporations would constitute a multi-employer unit exempted from Section 1362(a) and subject to the alternative provisions of Section 1364(a). Thus Section 1362(d)(2) could never apply to any situation.

But Kaplan's contention misreads the statute. Section 1364(a) applies to:

all employers who maintain a plan under which more than one employer makes contributions at the time such plan is terminated....

Where the "parent" owner of between 50% and 80% of its subsidiary's stock does not

---

4. This Court has not been provided with the additional facts required to determine whether the shareholdings in the two companies *before* October 1976 created a "common control" situation in brother-sister terms.

5. There is no Seventh Circuit authority on the subject. Briefing by the parties has disclosed two cases, which look in different directions.

*Contrast PBGC v. Ouimet Corp.*, 630 F.2d 4 (1st Cir. 1980) (Section 1301's definition of "employer" is applicable to Section 1362), *with PBGC v. Dickens*, 535 F.Supp. 922 (W.D.Mich. 1982) (Section 1301 does not necessarily apply to Section 1362). This opinion therefore undertakes its own analysis.

itself contribute to the pension fund, the situation described in *Ouimet* would not come within Section 1364. In turn Section 1362(d)(2) would not be superfluous under those circumstances.

But in this Court's view there is an even simpler explanation than straining to find discrete coverage for Section 1362(d)(2). Section 1362(d) was of course enacted contemporaneously with the rest of Section 1362, and it purported to deal *only* with corporate reorganizations and their effect on the statutory concept of "employer." Section 1301(b)(1) on the other hand looked to the future adoption of regulations to do double duty for ERISA and Code purposes, defining "single employer" concepts to apply whether or not a reorganization had taken place.

Even if those new Regulations established a broad-purpose definition of "single employer under common control" that would sweep up *all* of the Section 1362(d) coverage and more, that is no reason to reject such definition. Indeed Kaplan's argument (which is essentially that the Section 1362(d)(2) treatment of reorganizations invalidates any extension of the "single employer" concept *beyond* reorganizations) proves too much. Of course the parent and its wholly-owned subsidiary constitute the paradigmatic "common control" situation. Yet Kaplan's argument would bar the contemplated Section 1301(b)(1) regulations from covering that very situation at all—eviscerating the most logical and normal aspect of such regulatory coverage.[6]

In sum, the Regulations' plain meaning treats Kaplan and Anthony as a "single employer." And there is no reason to ascribe to Congress less than a full delegation of authority to adopt those Regulations and their plain meaning. With this approach, the remainder of the Kaplan assertions are readily dispelled.

Thus Kaplan tries to invoke ERISA's legislative history—one of the strongest factors in favor of PBGC's position. H.R.Conf. Rep.No. 93–1280, 93d Cong. 2d Sess. 376, reprinted in [1974] U.S.Code Cong. & Ad. News 4639, 5038, 5155, spoke of Sections 1301 and 1362 in these terms:

> In determining the employer who may be liable for insurance coverage losses of the corporation, all trades or businesses (whether or not incorporated) under common control are to be treated as a single employer. Trades or businesses under common control may, for this purpose, include partnerships and proprietorships as well as corporations.

Given that language, Kaplan can draw no comfort from a later section of the same report dealing with termination of a multiemployer plan:

> In this regard, it should be noted that the affiliated employer rules are to apply in this area. That is, if one member of an affiliated group has employer liability, then that liability is to extend to the entire affiliated group. Also, the 30-percent-of-net-assets limit is to apply with respect to the net assets of the entire group.

There is simply no room to imply from that language that a "single employer" in the "common control" context is to have a different meaning for *liability* purposes than for the *30% of net worth* calculation.

Kaplan's policy arguments in opposition to the Regulations merit equally short shrift:

(1) Kaplan says that to expose to Section 1362 liability all of the various common control relationships—parent-subsidiary, brother-sister and combined group—would be an "unheard of" broad sweep. That assertion neither constitutes nor as-

---

**6.** To put it another way, both Section 1301(b)(1) and 1362 reflect a congressional concern that the realities of business organization should prevail over the formalities of corporate structure in imposing liability to correct a perceived social problem: termination of employee benefits plans causing defeat of employee expectations as to their vested rights. It would be bizarre indeed if the most common of corporate plans to limit liability (this is not said in the pejorative sense)—creation of wholly owned subsidiaries—could not be dealt with, while the far less often encountered phenomenon of the brother-sister group of corporate entities could.

sists, and cannot substitute for, legal analysis.

(2) To negate the universality of the Section 1301-authorized definitions, Kaplan points to some ERISA sections in which it says "employer" could apply only to the direct employer that established the pension plan. For example Section 1304(e)(4) permits PBGC to reduce or waive Section 1362 liability where an employer is unable to continue a plan. Kaplan says only a direct employer can continue or discontinue a plan. Yet Congress could very logically have authorized PBGC to take into account the financial condition of closely-related corporate entities in exercising its discretion whether one of them truly "is unable to continue" a plan. Thus Kaplan's own example fails to prove the point. But more fundamentally, even if a broad definition at the beginning of a statute may have limited application to some of the following sections, that does not imply the definitional section should not be broadly applied where it can.

(3) Kaplan also contends Section 1362(d)(2) cannot have been designed to address the problem of a 50–79% owned subsidiary being liquidated into its parent, because nothing in the statute or its legislative history indicates such a congressional intent. Once again, in view of the literal language of the two statutes and the Regulations, it is Kaplan's burden to find legislative history specifically *rejecting* such application. Further, the Kaplan argument addresses only the *Ouimet* analysis and does not at all meet the more basic point stated in the text of this opinion.

(4) Kaplan next points out that when a multi-employer plan terminates, Section 1364 makes each employer liable only for its proportionate share of required contributions. Kaplan finds it anomalous that a member of a multi-employer group could have a lesser liability than a company that did not itself contribute to the

plan. Not so, for it is entirely reasonable to conclude that a corporation owning and controlling a direct employer should bear full ERISA responsibility, while entirely separate employers should incur only proportionate liability.

Finally this Court's conclusions are buttressed by post-Regulations congressional history (at the time of the 1980 amendment to ERISA). Senator Williams, one of the principal sponsors of both ERISA and the 1980 amendment, made the following statement as to the latter (126 Cong. Rec. S 11672 (daily ed. Aug. 26, 1980)):

> Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability. The leading case in this area is *Pension Benefit Guaranty Corporation v. Ouimet Corporation*, 470 F.Supp. 945 (D.Mass.1979), in which the court correctly held that all members of a controlled group are jointly and severally liable for employer liability imposed under Section 4062 of ERISA. The bill does not modify the definition of "employer" in any way, and the *Ouimet* decision remains good law.

In short none of the policy or legislative history arguments advanced by Kaplan is sufficient to overcome the strong presumption in favor of following the plain language of the statute and authorized Regulations. Kaplan and Anthony are a "single employer" for all Section 1362 liability purposes.

### *Constitutionality of Section 1362(d) As Applied to Kaplan* [7]

■ Kaplan challenges the retroactive application of Section 1362 (construed in accordance with the preceding section) to a

---

**7.** Under the analysis in the following pages, there is no distinction in due process terms between the period Kaplan owned a majority of

Anthony stock and its period of 100% ownership.

parent corporation like Kaplan, which acquired its interest in a subsidiary before ERISA's effective date. It complains that requiring it to fund Anthony's pension plan deficiencies takes Kaplan's property in violation of the Due Process Clause.

Any due process inquiry must determine whether such an application of Section 1362 is a rational means for achieving a legitimate end. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). Several cases have upheld the constitutionality of Section 1362's retroactive application to *direct* employers. *Nachman Corp. v. PBGC*, 592 F.2d 947, 958–63 (7th Cir. 1979) and, following the *Nachman* lead, *Ouimet*, 630 F.2d at 12–13, and *A–T–O, Inc. v. PBGC*, 634 F.2d 1013, 1024–26 (6th Cir. 1980). That due process analysis, however, changes when PBGC looks to a parent corporation that purchased its controlling interest before ERISA.[8]

In *Nachman* our Court of Appeals outlined what it termed the means-end test, 592 F.2d at 958–60 (citations omitted):

> The Supreme Court has confirmed that Congress has broad latitude to readjust the economic burdens of the private sector in furtherance of a public purpose. Only if Congress legislates to achieve its purpose in an "arbitrary and irrational way" is due process violated.
>
> \*     \*     \*     \*     \*     \*
>
> Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interest of the parties affected . . .; whether the impairment of the private interest is affected in an area previ-

ously subjected to regulatory control . . .; the equities of imposing the legislative burdens . . .; and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens. . . . It must be emphasized that although these factors might improperly be used to express merely judicial approval or disapproval of the balance struck by congress, they must only be used to determine whether the legislation represents a rational means to a legitimate end.

In those terms the equities favoring a parent corporation can be very different from those of the direct employer subsidiary.

When an established company sets up a pension plan providing past service credits, it has an economic choice. It can fund all past service liability at the inception. If it were to do so (and assuming continued soundness of the plan's actuarial assumptions) no Section 1362 problem would ever arise—for whenever plan termination occurred the vested benefits would be fully funded.

But employers have not been forced thus to immobilize large blocks of capital. Instead the IRS minimum funding regulations have permitted amortization of past service liability over many years. Exercise of that choice, though proper and lawful, leaves the plan underfunded if it is terminated before amortization is complete. In the meantime the employer enjoys the economic benefit of the current use of funds, substituting a contingent contractual liability to the pension fund for the up-front payment of funds.[9]

Section 1362, as applied to the direct employer that established a pension plan, simply neutralizes the effect of that initial economic choice. It gives the expectations

---

8. *Ouimet* did assess retroactive liability against a group of corporations under common control. In so doing the Court of Appeals simply adopted the *Nachman* analysis without addressing the due process problem posed by assessing a corporation other than a direct employer. That issue had however been discussed by the *Ouimet* District Court, 470 F.Supp. 945, 955–56 (D.Mass.1979). This Court disagrees with that analysis for the reasons stated in this opinion.

9. Before ERISA the employer was not obligated to undertake the legal obligation for future contributions covering past service liability. Under those circumstances the absence of a balance sheet liability would enhance its net worth materially, in contrast to that of the employer that divested itself of current assets to fund past service costs.

of employees in vested plan benefits a higher social priority than the employer's expectation that its commitment to make future contributions covering previously accrued (in actuarial terms) benefit rights was not *contractually* binding.

*Nachman* recognized the constitutional significance of the prior vesting of rights under a plan. It distinguished *Allied Structural Steel Co. v. Spannus*, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) in these terms, 592 F.2d at 961:

> First, the Minnesota statute imposed liability for payment of benefits to employees who, since they had not fulfilled service requirements, had no vested rights under the plan. Thus the Minnesota employer had a far greater reliance interest displaced than the only reliance displaced by Title IV—the belief that the company would not be liable for funding deficiencies in the event of a plan termination. The Minnesota employer had not funded the plan to ever accommodate payment of benefits upon completion of only ten years service, as the Act now required. This is the only reliance element emphasized by the Supreme Court in *Allied Structural Steel Co.*—an element not present in this case.

It is thus wholly rational—in due process terms—retroactively to require the direct employer to provide complete funding of vested pension plan benefits.[10]

Analysis for a parent corporation is entirely different—at least where (like Kaplan) it has acquired its subsidiary *after* the latter's establishment of its pension plan.[11] So long as the subsidiary remains a "closed container" in economic terms, the parent has derived no direct economic benefit from pension plan underfunding[12]—and of course *it* never promised the pension benefits. In such a situation there is no rational link between the congressional end of insuring pension benefits and the means of assessing the acquiring parent corporation to pay those benefits.

In *Ouimet* the District Court said, 470 F.Supp. at 955–56:

> Application of the controlled group liability theory fosters that purpose by preventing employers from using corporate segmentation as a shield from termination liability. The statute reflects Congress' judgment that, without controlled group liability, businesses could juggle their activity to eviscerate the termination liability provisions of ERISA.

But that argument logically applies only to a parent that purchases its controlling interest *after* ERISA's enactment. It distorts history to speak of "juggling" corporate structures to "eviscerate" ERISA's

---

10. Nor can the financially sound direct employer complain if its parent corporation's net worth is taken into account under an expanded "single employer" definition. Section 1362 never makes the direct employer liable for more than the full amount current funding of its plan would have required. In constitutional terms all direct employers *could* have been assessed for such full liability. When Congress inserted the 30%-of-net-worth ceiling on assessments, it made a value judgment that it did not want the previously-unknown assessment to absorb a major part of the economic worth of the enterprise. It could rationally temper that value judgment where the enterprise was part of an integrated corporate group—and it did so by taking into account the total net worth pool of that group. In that situation the parent is not directly assessed, but the subsidiary is required to come closer to, or to meet, the funding obligation it might constitutionally have been required to bear in any event.

11. This opinion does not reach the constitutional questions involved in imposing parent liability either (a) where the pension plan was newly created by an already-owned subsidiary or (b) where the parent purchased its controlling interest *after* ERISA's effective date (when the subsidiary's net worth, and hence the purchase price, would have been impacted by potential ERISA liability).

12. In fact, in light of the pre-ERISA balance sheet treatment of unfunded past service liability, it might be argued that a parent purchasing a subsidiary would already have borne (via a higher purchase price) some of the burden of underfunding. Such is not necessarily the case, for the rational economic investor presumably takes into account the subsidiary's future funding obligations in appraising future profit potentials—and hence in setting the purchase price.

provisions before ERISA created a wholly *new* concept of liability.[13]

But the foregoing analysis indicates the rationality, in due process terms, of holding the acquiring parent accountable for underfunding to the extent of any direct financial benefits it derived from the subsidiary during its affiliation.[14] Where funds have been siphoned off from the subsidiary,[15] it has been disabled pro tanto from meeting the responsibilities ERISA imposes. It is not irrational to call on the parent to make good on those liabilities to that extent (effectively restoring the subsidiary to where it would have been economically but for the transfers to the parent). In due process terms, ERISA could assess liability to the extent of those direct financial benefits, because they have a rational link with the public policy of insuring vested pension benefits through the direct employer's responsibility for past underfunding. Thus a parent might reasonably be held liable for such items as:

(1) dividends paid by the subsidiary, or the net effect of other intragroup transfers;

(2) the parent's lessened income tax payments resulting from deductions attributable to the direct employer's operating losses, plan contributions or other items; and

(3) any profits in excess of arms' length amounts derived from intragroup transactions.[16]

Application of such a concept would satisfy the *Nachman* means-end test, in a way that the full-scale imposition of liability on a parent solely because of its stock ownership could never do.[17]

### Conclusion

Section 1362 treats Kaplan and Anthony as a "single employer" for purposes of imposing liability and making the 30%-of-networth calculation. In so creating potential liability for parent corporation Kaplan, they are not constitutionally infirm on their face.

---

**13.** Indeed the scope of pre-ERISA pension fund regulation presents yet another distinction between parents and subsidiaries. *Nachman*, 592 F.2d at 962, noted that the direct employers' reliance interest was diminished by the fact that pension funds were subject to IRS regulations before ERISA. Those regulations did not apply to a non-contributing parent corporation.

**14.** Where as here the control relationship between the two corporations antedated the establishment of the 80% parent-subsidiary relationship, it would be constitutional to extend parent accountability to direct financial benefits obtained during the entire period of Kaplan's control of Anthony.

**15.** Once again no pejorative connotation is intended in thus characterizing entirely legitimate intragroup transfers or other transactions.

**16.** This discussion has focused on the constitutionality of imposing any parent corporation liability at all. As for including the parent's net worth for purposes of Section 1362's 30% calculation, once the parent becomes subject to assessment the 30% rule can only lessen—not enhance—its liability. Accordingly the analysis at n.10 applies with equal force here.

**17.** *PBGC v. Dickens*, referred to in n.5, illustrates the constitutional impermissibility of the latter approach. In *Dickens* a corporation ("Heinicke") wanted to purchase and reorga-

nize a direct employer ("Puffer-Hubbard") that had already filed a Chapter XI bankruptcy petition. When a second potential purchaser came along, Heinicke attempted to forestall the second purchaser by purchasing for $1 the stock of Puffer-Hubbard's parent corporation (Puffer-Hubbard was a wholly-owned subsidiary). Some ten days later the bankruptcy court approved a sale of Puffer-Hubbard's *assets* to the second purchaser. PBGC then sought to assess liability against *Heinicke* for a deficiency in Puffer-Hubbard's pension fund. *Dickens* held that:

> when the literal terms of the regulations would impose a substantial liability on a company whose ownership interest was a mere paper formality, who *could not* exercise any control over the operations of the owned company or over the pension plan which was terminated, and whose ownership interest was rendered entirely worthless by the court-ordered sale of assets of the owned company a few days after it was acquired, the unjustness of the result compels us to examine the underlying purposes of the statute and regulations involved.

Though the *Dickens* result was not phrased in terms of a due process violation were such liability imposed, it illustrates the woodenness of the PBGC position and is entirely consistent with the outcome of the due process analysis employed in this opinion.

They may however be unconstitutional *as applied* to Kaplan, for the treatment they mandate is constitutionally permissible only to the limited extent identified in the text. Because the parties have not provided enough facts to evaluate the validity or invalidity as to Kaplan, Kaplan's motion is denied and Kaplan is ordered to respond to PBGC's partial summary judgment motion by May 14, 1982.

## Appendix A

(b) Parent-subsidiary group of trades or businesses under common control—(1) General. The term "parent-subsidiary group of trades or businesses under common control" means one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest with a common parent organization if—

(i) A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 11.414(c)–4(b)(1), relating to options) by one or more of the other organizations; and

(ii) The common parent organization owns (directly and with the application of § 11.414(c)–4(b)(1), relating to options) a controlling interest in at least one of the other organizations, excluding, in computing such controlling interest, any direct ownership interest by such other organizations.

(2) Controlling interest defined—(i) Controlling interest. For purposes of paragraphs (b) and (c) of this section, the phrase "controlling interest" means:

(A) In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.

(c) Brother-sister group of trades or businesses under common control—(1) General. The term "brother-sister group of trades or businesses under common

control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 11.414(c)–4), singly or in combination, a controlling interest of each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization.

(2) Effective control defined. For purposes of this paragraph, persons are in "effective control" of an organization if—

(i) In the case of an organization which is a corporation, such persons own stock possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote of such corporation or more than 50 percent of the total value of shares of all classes of stock of such corporation.

(d) Combined group of trades or businesses under common control. The term "combined group of trades or businesses under common control" means any group of three or more organizations, if (1) each such organization is a member of either a parent-subsidiary group of trades or businesses under common control or a brother-sister group of trades or businesses under common control, and (2) at least one such organization is the common parent organization of a parent-subsidiary group of trades or businesses under common control and is also a member of a brother-sister group of trades or businesses under common control.