**PENSION BENEFIT GUARANTY CORPORATION, Plaintiff,**

v.

**ANTHONY COMPANY, et al., Defendants.**

**No. 81 C 1716.**

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1983.

On Motion for Certification Jan. 4, 1984.

sonable costs of assessing such injury, destruction, or loss resulting from such a release.

42 U.S.C. § 9607 (emphasis added).

Henry Rose, Gen. Counsel, James N. Dulcan, Asst. Gen. Counsel, Washington, D.C., Kenneth A. Henry, U.S. Dept. of Labor, Chicago, Ill., for plaintiff.

Mark S. Lieberman, Rosenthal & Schanfield, Chicago, Ill., for M.S. Kaplan Co.

John O. Collen, Gerald F. Munitz, Nachman, Munitz & Sweig, Ltd., Chicago, Ill., for Anthony Co.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Pension Benefit Guaranty Corporation ("PBGC") sues Anthony Company ("Anthony") and its parent company M.S. Kaplan Company ("Kaplan") under Employee Retirement Income Security Act of 1974 ("ERISA") § 4062, 29 U.S.C. § 1362 ("Section 1362"[1]), to recover the vested but unfunded benefits under Anthony's pension plan (the "Plan") as of the time of the Plan's termination. Anthony's trustee in bankruptcy (also referred to as "Anthony," simply for convenience) now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Anthony's motion is denied.

### Facts[2]

Anthony adopted the Plan May 1, 1955 to cover its union employees pursuant to its collective bargaining agreement with the UAW. On February 21, 1978 Anthony filed a petition under Chapter XI of the Bankruptcy Act. Then, finding itself unable to develop a viable plan of reorganization, Anthony sold its principal assets to a purchaser unwilling to adopt the Plan. Anthony terminated the Plan December 29, 1978 and ultimately shifted its Chapter XI petition into a straight bankruptcy proceeding June 20, 1979.

At the time of the Plan's termination there was a disparity of $1,361,369[3] between the current value of the Plan assets

---

1. This opinion will cite to Title 29 (in the form "Section—") rather than to ERISA's internal numbering.

2. In material part this section draws upon the factual statement in this Court's earlier opinion (the "Opinion," 537 F.Supp. 1048, 1050). Other factual sources are indicated by further footnotes.

3. Kaplan's Sept. 2, 1983 response to PBGC's First Request for Admissions.

and the employees' vested benefits. Under ERISA PBGC is obligated to make good that deficiency. Section 1362(b) gives PBGC the right in turn to recover from the "employer" the lesser of (1) the deficiency itself and (2) 30% of the "employer's" net worth as of a date not more than 120 days before the Plan's termination.

Kaplan has been Anthony's majority shareholder since April 1957. As the result of minor stock purchases over the intervening years, by September 1976 Kaplan owned 5,550 of Anthony's 10,000 outstanding shares. At that point Anthony itself contracted to purchase the 4,450 shares owned by shareholders other than Kaplan. That transaction was consummated October 21, 1976, leaving Anthony a wholly-owned Kaplan subsidiary through the date of Plan termination.

Based on the language of Section 1301(b)(1) and the interpretive regulations it authorizes and incorporates, the Opinion (537 F.Supp. at 1053) held Kaplan and Anthony were a "single employer" for Section 1362(b) purposes, both in terms of liability and in making the net worth calculation.[4] Anthony asserts it (considered alone) had no net worth on the critical date.[5]

### Anthony's Contention

Anthony now asserts it is liable neither to PBGC nor to Kaplan, relying entirely on *PBGC v. Ouimet Corp.*, 711 F.2d 1085 (1st Cir.1983) ("*Ouimet II*"), cert. denied, —— U.S. ——, 104 S.Ct. 393, 78 L.Ed. 337

**4.** Although that holding made Kaplan vulnerable to possible liability (despite the fact the Plan had never covered any employees but Anthony's), due process concerns led to this Court's holding Kaplan liable to PBGC only to the extent of Kaplan's direct financial benefit derived from Anthony during their affiliation, 537 F.Supp. at 1056; see also the supplement to the Opinion, 542 F.Supp. 43, 44 (N.D.Ill.1982).

**5.** Anthony's trustee has filed a Sept. 6, 1983 affidavit (in wholly conclusory terms and based solely on his examination of Anthony's books and records and its bankruptcy filings) asserting its liabilities exceeded its assets throughout the relevant 120-day period. Kaplan's memorandum in opposition says the bankrupt's estate currently comprises over $1 million in cash plus a lawsuit against Kaplan and others seeking

(1983). In part *Ouimet II, id.* at 1087–88, 1093–94 reaffirmed the First Circuit's earlier holding in the same case, 630 F.2d 4, 12 (1st Cir.1980) ("*Ouimet I*")—a holding discussed and concurred in by the Opinion[6]—that multiple corporations under "common control" were a "single employer" for purposes of the Section 1362(b) 30%-of-net-worth calculation. Two of the corporations within that "single employer" Ouimet Group had gone bankrupt and terminated their pension plans. Even though *Ouimet I* had affirmed the district court's imposition of joint and several liability on the entire Group (including the bankrupt corporations), *Ouimet II,* 711 F.2d at 1091–93 shifted ground entirely: It apportioned the Section 1362(b) liability solely among the solvent, non-bankrupt Group members. That decision, says Anthony, compels its own exculpation here.

### Meaning and Application of Section 1362(b)

■ Any straightforward reading of Section 1362(b) reveals there is something very bizarre about the *Ouimet II* construction:

(b) Any employer to which this section applies shall be liable to [PBGC], in an amount equal to the lesser of—

(1) the excess of—

(A) the current value of the plan's benefits guaranteed under this subchapter on the date of termination over

$2.375 million in compensatory and $1 million in punitive damages. Though there are thus serious doubts Anthony has met its Rule 56 burden in factual terms, this opinion will assume (though only arguendo) Anthony's negative net worth.

**6.** At the time of the Opinion one other court had considered the issue and reflected some doubt under the circumstances before it (see the Opinion, 537 F.Supp. at 1051 n. 5, 1056 n. 17). Just within the past month the Court of Appeals for the Sixth Circuit dealt with that other case on appeal, but the Court of Appeals' approach to the special problem before it apparently obviated the need to deal with the issue at all, as both *Ouimet* cases and the Opinion had to do. *PBGC v. Dickens,* 719 F.2d 146 (6th Cir.1983).

(B) the current value of the plan's assets allocable to such benefits on the date of termination, or

(2) 30 percent of the net worth of the employer determined as of a day, chosen by [PBGC] but not more than 120 days prior to the date of termination computed without regard to any liability under this section.

As *Dickens*, 719 F.2d 146 put it:

The issue is one of statutory construction and not, as the PBGC would have it, judicial legislation.[7]

After all Section 1362(b) *literally* places liability on "the employer," and the real "employer"—the one that hired and used the employees and adopted the now-terminated plan—is the bankrupt corporation. It took a fiction, in the form of a definition that swept up other non-employing, non-plan-adopting entities into the "employer" category, to make those other entities potentially liable to PBGC at all. But it surely involves sleight of hand to convert:

"any employer ... shall be liable...."

first to read:

"any employer [including the common-control affiliates of the actual employer] ... shall be liable...."[8]

and then, by a quantum leap, to read:

"any employer [including the common-control affiliates of the actual employer but *excluding* the actual employer itself] ... shall be liable...."

That was nonetheless the result in *Ouimet II*. Evaluation of that result, and its possible applicability here, requires a recapitulation of the First Circuit's analysis,[9] which was essentially this:

1. ERISA imposes liability on an employer for plan underfunding (a) to deter employers from making unrealistic benefit promises to employees and (b) to prevent abuse of the termination insurance program (*Ouimet II*, 711 F.2d at 1092).

2. Nevertheless Congress intended by the Section 1362(b) 30%-of-net-worth limitation to avoid imposing extreme economic hardship on employers who had to terminate their plans (*id.* at 1091).

3. All members of the Ouimet Group participated in labor negotiations that resulted in promises to increase benefits, and all of them did benefit from the bankrupt's plan to the extent of income tax deductions (*id.* at 1092).

4. For those reasons and even though the statutory language does not indicate any sort of liability allocation, in the contest among the bankrupt's creditors, the Ouimet Group's solvent members and PBGC, the solvent members should bear the loss (*id.* at 1091).

As the initial paragraph in this section implies, this Court is left entirely unpersuaded by the *Ouimet II* rationale. Most fundamentally, the plain language of Section 1362(b) does not really allow for such a skewed reading. That alone precludes a search for a different and strained construction, under which the real "employer" in a common-control group is rendered nonliable while the non-employing units remain liable as the "employer" for Section 1362(b) purposes. Even were that not the case however—even were a resort to legislative history appropriate—that history affirmatively supports joint and several liability. Opinion, 537 F.Supp. at 1052–53. Indeed the most striking fact in that respect—one wholly ignored by *Ouimet II* though honored in *Ouimet I*—is the statement by Senator Williams (a principal sponsor of both ERISA and its 1980 amendment) at the time of that amendment, quoted in the Opinion, 537 F.Supp. at 1048 (emphasis added):

Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of em-

---

**7.** Here the proponent of the judicial legislation, relying on the *Ouimet* invitation, is Anthony.

**8.** This meaning is mandated by Section 1301(b)(1) and its concomitant regulations, as both *Ouimet I* and the Opinion held.

**9.** No cases in this Circuit (or apparently elsewhere) have addressed the issue.

ployer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability. The leading case in this area is *Pension Benefit Guaranty Corporation v. Ouimet Corporation,* 470 F.Supp. 945 (D.Mass.1979), in which the court correctly held that all members of a controlled group are *jointly and severally liable* for employer liability imposed under Section 4062 of ERISA. *The bill does not modify the definition of "employer" in any way, and the Ouimet decision remains good law.*[10]

But there is more than the clear language and legislative history of Section 1362(b) itself to support Anthony's liability. Another ERISA provision, Section 1368(c)(2), specifically grants PBGC a lien on the assets of any "employer" liable under Section 1362 and involved in bankruptcy proceedings.[11] That provision would have no meaning were there no Section 1362 liability to PBGC on the part of insolvent corporations. *Ouimet II,* 711 F.2d at 1091 seeks to pose the issue as a different one (between the other members of the common-control group and the creditors of the direct employer). However, that really ignores the fact the question is one of *liability to PBGC*—and the Section 1368 provisions (like Section 1362(b) and the congressional intention) confirm precisely that liability.

In that respect it is relevant (though not essential to this opinion) that the Opinion has already limited Kaplan's liability to PBGC because of due process considerations. According to Kaplan's Sept. 2, 1983 answer to PBGC's Second Interrogatories,

Kaplan derived no more than $155,970 in direct benefits from its relationship with Anthony; and that figure marks the limit of Kaplan's Section 1362(b) liability to PBGC. That places the conflict for the remaining approximately $1.2 million in unfunded liability squarely between *PBGC* and *Anthony's creditors* (unlike the *Ouimet II* situation, see 711 F.2d at 1091). And in that contest Section 1368(c)(2) and 1368(a) specifically dictate a lien and priority in favor of PBGC.

One final (though parenthetical) point may be made. *Ouimet II* considered it unjust to require the bankrupts' creditors to stand the cost of the underfunded plans. Even apart from the fact such "injustice" has in fact been prescribed by Congress, the *Ouimet II* analysis fails to consider one important factor: By its very nature underfunding of the employees' plans has increased the bankrupt's net worth throughout its pre-bankruptcy history to and including the date of filing. Looked at in one way, that has already enabled the bankrupt to pay its creditors amounts they would never have received had the bankrupt fully funded its plan obligations to its employees. From another perspective the bankrupt estate at the filing date was enlarged to the precise extent of the underfunding, an amount the creditors can scarcely claim as a matter of right (or even justice). In short, just as the solvent members of the Ouimet Group may have benefited from promises to increase plan benefits (a factor not present in this case), a bankrupt's creditors really derive a windfall to the extent they are permitted to benefit from the employees' plan having been underfunded.

Indeed the dramatic contrast between the Ouimet situation and the one before

---

**10.** That *Ouimet* decision was the one affirmed in *Ouimet I.* Its reasoning conformed to the holding in the Opinion and in this opinion.

**11.** Section 1368(c)(2) provides:
In the case under Title II [sic] or insolvency proceedings, the lien imposed under subsection (a) of this section shall be treated in the same manner as a tax due and owing to the United States for purposes of Title 11 or in section 191 of Title 31.

Section 1368(a), which imposes the lien referred to in Section 1368(c)(2), reads:
(a) If any employer or employers liable to [PBGC] under section 1362, 1363, or 1364 of this title neglect or refuse to pay, after demand, the amount of such liability (including interest), there shall be a lien in favor of [PBGC] upon all property and rights to property, whether real or personal, belonging to such employer or employers.

this Court is pointed up by what happened to the respective plans' unfunded liability during the period the bankrupt and non-bankrupt corporations were under "common control" as defined in the regulations. In the Ouimet Group the plan's underfunding *increased* from $92,000 to $552,000 during that period (*Ouimet II*, 711 F.2d at 1087), while here such underfunding *decreased* by some $300,000 (see Kaplan Mem. 4). Thus any decisions that might arguably be laid at the door of the non-bankrupt members of the commonly-controlled group would have diminished the assets available to the creditors if PBGC had prevailed in *Ouimet II.* Conversely the assets available to the creditors in the present case would be increased by the increased plan funding if PBGC (and Kaplan) were not permitted to prevail in this case.

### Conclusion

Anthony's contentions do not conform to ERISA's provisions or their purposes. Anthony's motion for summary judgment against PBGC and Kaplan is denied.

### SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

#### On Motion For Certification

Pension Benefit Guaranty Corporation ("PBGC") sues Anthony Company ("Anthony") and its parent company M.S. Kaplan Company ("Kaplan") under Employee Retirement Income Security Act of 1974 ("ERISA") § 4062, 29 U.S.C. § 1362, to recover the vested but unfunded benefits under Anthony's pension plan (the "Plan") as of the time of the Plan's termination. This Court's November 16, 1983 memorandum opinion and order (the "Anthony Liability Opinion") denied Anthony's motion for summary judgment.

1. PBGC has once before sought such Section 1292(b) certification. It was unsuccessful. 542 F.Supp. at 43, 45 (N.D.Ill.1982).

2. For this purpose it is irrelevant that both opinions are grounded in substantial legal precedent and that *this* Court obviously views them as totally sound.

Anthony now moves for certification of the Anthony Liability Opinion for immediate appeal under 28 U.S.C. § 1292(b) ("Section 1292(b)"). PBGC favors such certification if this Court also certifies its April 27, 1982 memorandum opinion and order (the "Kaplan Liability Opinion", 537 F.Supp. 1048 (N.D.Ill.1982)).[1] Kaplan opposed certifying either issue. For the reasons stated in this memorandum opinion and order, Anthony's motion is denied, as is PBGC's gloss on that motion.

Section 1292(b) allows a Court of Appeals to permit an appeal from an otherwise non-reviewable order. First, though, the District Court must find:

1. the order involves a controlling question of law

2. as to which there is a substantial ground for difference of opinion, and

3. an immediate appeal from the order may materially advance the ultimate termination of the litigation.

No one can cavil at the notion that both the Anthony Liability Opinion and the Kaplan Liability Opinion—in part embarking on uncharted legal seas and in part disagreeing with responsible legal authority[2]—involve questions of law as to which there is a substantial ground for difference of opinion. Whether those questions are in fact "controlling" in this litigation—the first level of Section 1292(b) inquiry—is a more complex question, as to which Kaplan's submissions on the current motion raise several substantial doubts. But those doubts need not be resolved because of the clear failure to satisfy the third criterion: a standard inadequately addressed in substantive terms by the parties, each of whom has merely parroted the statutory language.[3]

3. Anthony says an immediate appeal will facilitate termination of its bankruptcy proceeding. That is not of course the question Section 1292(b) poses. Its inquiry is rather whether an immediate appeal will advance termination of *this* lawsuit.

To determine whether "an immediate appeal ... may materially advance the ultimate termination of [*this*] litigation," this Court must evaluate the current stage of the action (including what issues remain to be decided) in terms of the lawsuit that would remain if an immediate appeal were allowed. Such a comparative analysis focuses on the time and expense an immediate appeal would save if issues were eliminated.[4] *Kennard v. United Parcel Service, Inc.*, 531 F.Supp. 1139, 1149 (E.D. Mich.1982); *Gunter v. Hutcheson*, 492 F.Supp. 546, 566 (N.D.Ga.1980); *Stong v. Bucyrus-Erie Co.*, 476 F.Supp. 224, 225 (E.D.Wis.1979).

Three issues appear to remain in this action:[5]

1. determination of the amount of Kaplan's "direct financial benefit" from Anthony;

2. determination of 30% of the employer group's net worth; and

3. resolution of Kaplan's and Anthony's crossclaims, each asserting the other is primarily liable for the Plan's underfunding.[6]

No party has really addressed how much expense or time would be incurred in resolving those issues. At least facially such expense and time would not appear substantial, for the first two issues involve matters of accounting on which the parties have for some time been engaged in discovery and analysis, while the third issue seems primarily a legal question (and certainly involves no more facts than the first two).

Which of those issues would be eliminated if an immediate appeal were allowed? If both Opinions were affirmed, all the same issues would still have to be determined. If the Kaplan Liability Opinion were reversed in part by a holding Kaplan was not part of the employer group,[7] issues 1 and 3 would no longer need decision.[8] If the Kaplan Liability Opinion were reversed in part by a decision Kaplan was liable for all the underfunding (not just for the amount of its direct financial benefit), issue 1 would be eliminated. If the Anthony Liability Opinion were reversed by a decision Anthony is not liable to PBGC if Anthony had no net worth on the relevant date, issue 3 could be eliminated—but only if in fact Anthony had no net worth, a fact that would need to be determined on remand.

Thus only one possible scenario would eliminate more than one issue—and that scenario appears the least likely of all the alternatives. Moreover Kaplan contends it has in fact computed the amount of its direct financial benefit, so that the one issue on which decision might be unnecessary in a number of the variant alternatives is at least close to resolution.

By definition, time and expense will not be saved if issues are not eliminated. And

---

4. Plainly certification of the Anthony Liability Opinion alone could not fare as well in any comparative analysis as certification of both Opinions. Accordingly this opinion will analyze the question in terms of dual certification, recognizing that rejection of such certification would a fortiori control Anthony's more limited motion.

5. Because the parties themselves did not address the relevant evaluation, this summary is based on this Court's view of the litigation. It does not constitute a definitive "finding" that all other issues have been resolved. In this respect one added factor militates against full certification: It is always possible in complex litigation that the factual setting developed for final disposition may cast a different light on legal questions that were decided earlier in abstract terms, thus calling for reexamination. That is at least one

of the reasons interlocutory orders always remain open for review by the trial court until the litigation is disposed of by a final judgment.

6. All parties have stipulated the amount of the underfunding is $1,361,139.

7. Of all the issues dealt with in the Opinions, this one seems least·likely to be open to question. Moreover, a definitive ruling on the effect of this decision in real rather than abstract terms requires further development of the record as to pre-October 1976 shareholdings, to determine whether Kaplan was part of the employer group in that period. See Kaplan Liability Opinion, 537 F.Supp. at 1050–51 & n. 4.

8. Anthony's cross-claim against Kaplan is predicated on Kaplan's being a part of the employer group.

it should be recognized that even were it otherwise, certification would not necessarily follow. After all, the same issue-elimination analysis would militate in favor of certification in *every* lawsuit in which liability has been determined (whether by partial summary judgment or in a bifurcated hearing) but damages have not. Yet courts consistently recognize the compelling considerations favoring a single rather than piecemeal appeals in such circumstances. *Freeman v. Kohl & Vick Machine Works, Inc.*, 673 F.2d 196, 201–02 (7th Cir.1982). Those few cases in which Section 1292(b) certification has in fact been made involved a far different balance of factors than is posed here.

In short, no party has shown how an immediate appeal from both Opinions would save time and expense or narrow the issues so as *materially* to advance the termination of this action.[9] This is not a case where further district court proceedings will moot a party's ability to have an issue reviewed or will impose a burden on these litigants greater than that on any other litigant forced to await a final judgment before appealing. *Freeman*, 673 F.2d at 201–02 n. 13.

### Conclusion

Anthony's motion for Section 1292(b) certification is denied, both alone and as supplemented by PBGC's proposed expansion of such certification. This action will continue toward the most expeditious feasible resolution of all remaining issues.[10]

---

**9.** This Court recognizes Section 1292(b) speaks in terms of "may ... advance" and not "will ... advance." That occasions no change in the analysis or the result reached here. See Comment, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 99 Harv.L. Rev. 607, 625–28 (1975).

**10.** After this opinion was written but before its transcription, our Court of Appeals dealt with another aspect of ERISA's constitutionality in *Peick v. PBGC*, 724 F.2d 1247 (7th Cir.1983).

Though *Peick* resolved the standard of constitutionality left open in *Nachman Corp. v. PBGC*, 592 F.2d 947 (7th Cir.1979), *aff'd on nonconstitutional grounds* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), and though the Kaplan Liability Opinion followed *Nachman*, an initial reading of *Peick* gives no indication the Kaplan Liability Opinion needs reconsideration. That is a matter the parties will want to review for themselves in future proceedings.